# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ivan Pentchev Iontchev, et al., | No. CV-12-00256-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| AAA Cab Incorporated, et al., | |
| Defendants. | |

Plaintiffs are taxicab drivers suing Defendant AAA Cab[1] for failure to pay the minimum wage. AAA Cab's original motion for summary judgment was not convincing. Only after Court prompting was AAA Cab able to clarify the many ways in which its relationship with its drivers is dictated by government regulation.[2] Based on the briefs and underlying evidence, AAA Cab is now entitled to summary judgment.

## BACKGROUND

This case involves three relationships: the relationship between AAA Cab and the City of Phoenix ("City"), the relationship between the City and all taxi drivers operating

---

[1] The drivers name several entities and individuals as defendants and the parties do not differentiate between the various defendants. For simplicity, the Court will refer to Defendants collectively as "AAA Cab."

[2] AAA Cab's original motion made vague references to regulations that controlled the manner in which the taxicab drivers worked. (Doc. 215 at 3). As noted in the Court's proposed order, AAA Cab's submissions were insufficient because they did not provide *specific* citations to the governing regulations. (Doc. 236 at 13). After the Court identified AAA Cab's failure, defense counsel submitted copies of the regulations actually applicable to taxicab drivers.

at the airport, and the relationship between AAA Cab and its drivers.

### A. Relationship Between AAA Cab and the City

AAA Cab owns a fleet of taxicabs in Phoenix. AAA Cab has a contract with the City to provide taxicab service to Phoenix Sky Harbor International Airport ("PHX"). This is not an exclusive contract as other companies are also permitted to provide taxicab services at the airport. However, only those companies with a contract are permitted to pick up passengers at the airport. (Doc. 207-1 at 13-15).

The contract between AAA Cab and the City sets forth, in great detail, what is required of AAA Cab. The contract requires AAA Cab maintain a fleet of 140 to 180 vehicles. For each vehicle, AAA Cab pays the City just over $16,000 per year as well as $1.00 for each fare initiated at the airport. AAA must have a "non-driver supervisor" on-duty at all times. That supervisor is "responsible for the daily activities of all drivers." That means the supervisor must "provide continuous daily monitoring of all drivers and ensure driver compliance with all PHX rules, regulations, and procedures." (Doc. 207-1 at 121). The contract makes AAA Cab "directly responsible for the conduct of all drivers operating under the Contract, notwithstanding the legal relationships entered into by and between [AAA Cab] and the driver." (Doc. 207-1 at 123).

Per the contract, AAA Cab must conduct background checks on all drivers, ensure drivers are at least nineteen years old, screen drivers for "alcohol and substance abuse," and ensure that all drivers have completed a defensive driving course within the preceding two years. (Doc. 207-1 at 124). If a driver violates an airport rule or regulation, the City can fine AAA Cab. And AAA Cab is required to "remove any driver . . . upon a determination the individual has been assigned a duty for which he or she is not qualified for either suitability or security reasons, or is found to be unfit for the performance of duties." (Doc. 207-1 at 123).

The contract requires AAA Cab "charge fares at rates equal to or less than maximum meter rates established by Phoenix City Code." (Doc. 207-1 at 116). Each vehicle is required to have "electronic credit card transaction equipment to accept credit

card transactions as payment for fares." And passengers cannot be charged any fee for paying via credit card. (Doc. 207-1 at 116).

### B. Relationship Between the City and Drivers

The second relationship is that between the City and all drivers operating at the airport. Taxi service at the airport is heavily regulated by the City. The Phoenix City Code states the Aviation Director of the City of Phoenix or his designee "may promulgate such rules and regulations deemed by him necessary to make safe, efficient and orderly the operation of ground transportation motor vehicles on City of Phoenix airports." Phoenix City Code, Chapter 4, Art. IV, 4-71. Pursuant to this power, the Aviation Director issued "rules and regulations . . . for the purpose of establishing procedures for licensing of, and defining permitted and prohibited conduct for Contracted Taxicab/Limousine Service companies and drivers at Phoenix Sky Harbor International Airport." (Doc. 242-1 at 62). Those regulations provide detailed dress and grooming requirements for drivers, including:

- shirts or blouses must be "of a solid color";
- hair must "be kept clean and trim at all times";
- "[b]ody odor shall be controlled so as not to be offensive";
- "[p]roper oral hygiene shall be used"; and
- "[f]ace and body shall be kept clean." (Doc. 242-1 at 67).

The regulations also provide detailed requirements regarding vehicles. All vehicles must be:

- "free of oxidation and rust";
- "free of any sheet metal damage";
- inspected each day and found to be "free of dirt, trash, and debris";
- "swept or vacuumed" every day;
- free from "road dust, mud and grime"; and
- equipped with hubcaps "on all wheels at all times."

(Doc. 242-1 at 67). As for the actual process of transporting passengers, the City Code

requires drivers use the most direct route. (Doc. 242-1 at 19; Phoenix City Code, Chapter 36, Article XIV, 36-204).

If a driver or vehicle violates a regulation the City has a system of escalating sanctions that eventually leads to revocation of the driver's ability to service airport passengers. (Doc. 242-1 at 71). The parties have not presented clear evidence on how often the City pursues such sanctions. However, it appears rare for the City to do so. Instead, the City relies on AAA Cab to monitor the drivers and ensure compliance with the regulations.

**C. Relationship Between AAA Cab and Drivers**

The final and most important relationship is that between AAA Cab and its drivers. While the parties have stark disagreements on certain aspects of this relationship, the following facts are undisputed unless otherwise noted.

An individual who wants to become an airport driver must submit an application to AAA Cab. Upon receiving the application, AAA Cab runs a variety of background checks. (Doc. 207-3 at 33). If the background checks do not uncover anything troubling, the individual is referred to the airport to obtain an airport identification badge. Once that badge is obtained the individual can become an airport driver.

To start driving, a driver must pay AAA Cab approximately $854.00 per week to "lease" a taxicab. All drivers pay this same amount. After paying the lease, the driver is free to work as much or as little as he wishes, with the driver retaining all the fares earned from passengers.[3] The driver undergoes training provided by AAA Cab, although the extent of that training is disputed. AAA Cab supervises the drivers while they are working, but again the extent of that supervision is disputed. It is undisputed, however, that AAA Cab has a supervisor at the parking lot where drivers wait to be called to the airport. At the parking lot, the supervisor "[c]heck[s] vehicles for cleanliness [and] safety

---

[3] There are a few exceptions to the drivers retaining all fares. For example, AAA Cab retains a percentage of the fare when a passenger pays with a credit card and the driver uses the credit card machine provided by AAA Cab. AAA Cab also collects from the drivers the fee imposed by the airport for each trip. (Doc. 225 at 5).

- 4 -

issues." (Doc. 207-3 at 21). If the supervisor notices a problem, such as a mechanical issue with the taxicab, the driver will be sent to the AAA Cab office for it to be fixed. The supervisor also checks "IDs to make sure the drivers [sic] that's supposed to be driving that vehicle is driving it." (*Id.*). Assuming an authorized individual is serving as driver, the supervisor ensures the driver is in compliance with the dress code and "hygiene" requirements. If the driver is not in compliance, the supervisor instructs the driver to comply. (Doc. 207-3 at 57).

Beyond the foregoing, AAA Cab controls other aspects of driver behavior such as:
- drivers must appear for vehicle inspections at times set by AAA Cab;
- drivers must report fuel usage to AAA Cab;
- drivers must report accidents to AAA Cab immediately;
- if a customer is unhappy with a driver, the customer may complain to AAA Cab. AAA Cab has complete discretion whether to issue a refund based on a complaint. If a refund is issued, AAA Cab pays the passenger and then passes that charge on to the driver; and
- AAA Cab controls the advertising placed on the taxicabs and receives the revenue from those advertisements.

AAA Cab does not control other important aspects of driver behavior. For example, drivers are allowed to pick up fares away from the airport. But this is not a common practice as most drivers choose to return to the airport as quickly as possible. Airport drivers are also allowed to pass out business cards and develop their own clientele. But again this is not a common practice and most drivers rely exclusively on airport passengers. Finally, drivers are free to hire "relief drivers" when they are not driving. The evidence is not clear on the extent of control AAA Cab has over the selection and use of relief drivers. The relief drivers, like the primary drivers, are required to have an ID from the airport allowing them to serve as drivers. The primary drivers, not AAA Cab, control the relief drivers' work schedules and compensation.

Based on the foregoing, AAA Cab classified its airport drivers as independent

contractors. Because of that classification AAA Cab has very few records regarding the hours worked or fares earned by each driver. According to estimates provided by one airport driver, he generally worked either 15.5 or 16 hours per day, between 3.5 and 7 days per week. (Doc. 226-4 at 67-70). Working those hours, he earned between $135 and $225 in fares per day. Once the cost of leasing the vehicle was subtracted, this driver claims to have earned an hourly wage between $0.94 and $6.56. Another driver submitted similar estimates, claiming he worked between 12 and 18 hours per day, 7 days a week, for over a year. AAA Cab claims these estimates "are remarkably unrealistic and inconsistent." (Doc. 215 at 12). And AAA Cab makes a general assertion, unsupported by admissible evidence, that no rational person would engage in the "back-breaking" work schedule described by the drivers for so little pay. (Doc. 215 at 13).

## ANALYSIS

### A. Standard for Summary Judgment and Burden of Proof

The parties' cross-motions for summary judgment require different views of the underlying evidence depending on which motion is being evaluated. The drivers' motion requires viewing the evidence in the light most favorable to AAA Cab while AAA Cab's motion requires viewing the evidence in the light most favorable to the drivers. Fortunately, most of the facts are not disputed. The parties' true dispute is on the legal conclusion to be drawn from the underlying facts. That is, in light of the underlying facts, whether the drivers should be considered employees or independent contractors. *See Harris v. Vector Marketing Corp.*, 656 F. Supp. 2d 1128, 1136 (N.D. Cal. 2009) ("Under federal law . . . [t]he existence and degree of each factor [regarding the status of a person as an independent contractor or employee] is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law.") (internal quotation marks and citation omitted).

The summary judgment analysis is complicated in one respect. The complaint contains a claim under the Fair Labor Standards Act ("FLSA") as well as a claim under Arizona law. Pursuant to Arizona law, "whether a person is an independent contractor or

an employee shall be determined according to the standards of the [FLSA]." A.R.S. § 23-362(D). Thus, in general, the same analysis must be used when assessing the drivers' classification under the FLSA and Arizona law. But there is an important exception. The FLSA requires the drivers prove they were employees by a preponderance of the evidence. *See, e.g.*, *Johnson v. Unified Gov't of Wyandotte County*, 180 F. Supp. 2d 1192, 1195 (D. Kan. 2001) ("[T]he jury found that plaintiffs failed to prove by a preponderance of the evidence that they were employees of the Housing Authority rather than independent contractors."). This requires the drivers show it is "more likely than not" that they are employees. *See United States v. Flores*, 725 F.3d 1028, 1036 (9th Cir. 2013) (explaining preponderance standard). Arizona law requires application of a very different framework.

Arizona law imposes the "burden of proof [on] the party for whom the work is performed to show independent contractor status by clear and convincing evidence." A.R.S. § 23-362(D). Thus, under Arizona law, the drivers must be considered employees unless AAA Cab can show, by clear and convincing evidence, the drivers are independent contractors. This requires AAA Cab show it "is highly probable or reasonably certain" the drivers are independent contractors. *Mondaca-Vega v. Holder*, 718 F.3d 1075, 1083 n.5 (9th Cir. 2013) (citation and quotation omitted). If AAA Cab cannot make this showing, the drivers must be deemed employees. The difference between Arizona and federal law raises the possibility that, in a close case, individuals might be deemed independent contractors under the FLSA but employees under Arizona law, even though Arizona law purports to be requiring application of the same FLSA standard. *See Arizona Voters Approve Minimum Wage Act*, Ogletree Deakins (November 9, 2006) available at http://www.ogletreedeakins.com/sites/default/files/uploads/publications/2006-11__arizona-eauthority.pdf (noting it was "possible that a person who is properly treated as an independent contractor under other employment laws could be found to be an employee under [Arizona's] new minimum wage law").

**B. Employee or Independent Contractor**

The drivers believe they are "employees" in light of the amount of control exercised by AAA Cab. AAA Cab counters that the drivers are "independent contractors" because they are free to work in whatever manner they wish. The FLSA requires the Court focus on the actual working conditions when deciding how the drivers should be classified. Under those conditions, AAA Cab is correct.

"Courts have adopted an expansive interpretation of the definition of 'employer' and 'employee' under the FLSA, in order to effectuate the broad remedial purpose of the [FLSA]." *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979). Under that expansive interpretation, "employees are those who *as a matter of economic reality* are dependent upon the business to which they render service." *Id.* Courts often invoke six factors when analyzing the "economic reality" of a situation. These factors, however, are not exhaustive and "[t]he presence of any individual factor is not dispositive of whether an employee/employer relationship exists." *Id.* Importantly, the "economic reality" controls regardless of whether the drivers and AAA Cab have contracts purporting to describe their relationship. In fact, even "the subjective intent of the parties . . . cannot override the economic realities reflected in the factors." *Id.* Keeping in mind the holistic nature of this inquiry, each factor is analyzed below.

**i. Manner of Work**

The first factor requires assessing "the degree of [AAA Cab's] right to control the manner in which the work is to be performed." *Real*, 603 F.2d at 754. The parties present different views regarding this factor but the undisputed evidence establishes it is the City, not AAA Cab, dictating most of the drivers' working environment. In fact, once control by the City is considered, AAA Cab has relatively little say in the manner in which the drivers perform their work.

The Ninth Circuit recently addressed the most relevant aspects of the relationship between a taxicab company and its drivers when deciding whether the drivers qualify as employees. In *NLRB v. Friendly Cab, Inc.*, 512 F.3d 1090, 1098-1011 (9th Cir. 2008),

the Ninth Circuit held taxi drivers qualified as employees not independent contractors under the stricter test for determining individuals' right to collectively bargain. *Id.* at 1096. The decision began by noting there is a "strong inference" that taxi drivers should be considered independent contractors if the drivers pay "a fixed rental rate" and "retain all fares collected without accounting" to their alleged employer. *Id.* at 1097. The decision also noted an additional indication of independent contractor status is when an alleged employer does not "set hours or a minimum number of hours." *Id.* The drivers in *Friendly Cab* paid a fixed rental rate and controlled their own schedule but these factors were not dispositive given other elements of the drivers' relationship with their alleged employer.

The alleged employer in *Friendly Cab* "sought to control the means and manner of its drivers' performance by regulating the manner in which they dr[ove], impos[ed] a strict disciplinary regime, requir[ed] drivers to carry advertisements without receiving revenue . . . impos[ed] a strict dress code, and requir[ed] training in excess of government regulations." *Id.* at 1099. Moreover, the drivers in *Friendly Cab* were "not permitted to operate independent businesses" nor were they allowed to sublease their vehicles. *Id.* (quotation and citation omitted). Based on these indications of control, the *Friendly Cab* court determined the drivers were employees notwithstanding the fixed leases and lack of fixed schedules.

Similar to the drivers in *Friendly Cab*, the drivers here pay a fixed rental rate. This fact entitles AAA Cab to a "strong inference" that the drivers are independent contractors. The drivers here are also free to set their own work schedules. But unlike the drivers in *Friendly Cab*, the drivers here are free to develop their own business and free to sublease their vehicles. Moreover, unlike the employer in *Friendly Cab*, AAA Cab does not have its own substantial discipline regime. It is the City, not AAA Cab, that controls the way the drivers dress, their personal hygiene, the exterior and interior of their vehicles, and the routes they must use when ferrying customers. And a disciplinary regime pursuant to government regulation "does not constitute any degree of control."

*NLRB v. Friendly Cab Co., Inc.,* 512 F.3d 1090, 1098 (9th Cir. 2008). Moreover, while AAA Cab controls the advertisements placed on the vehicles, that amount of control is minor compared to the control exercised by the drivers over their day-to-day work activities.

Overall, the undisputed facts show that as a matter of economic reality AAA Cab exercises little control over the activities of its drivers. What initially appeared to be substantial aspects of control (*i.e.*, supervision of grooming, hygiene, state of vehicle, choice of route) are due to City regulation. And the control *not* applicable to City regulation (*e.g.*, placement of advertisement on vehicles) is, in comparison, very minor. Instead of substantial control, AAA Cab has very little say in the manner in which the drivers perform their work. The first factor, therefore, strongly supports an independent contractor relationship.

### ii. Profit or Loss

The second factor depends on the drivers' "opportunity for profit or loss depending upon [their] managerial skill." *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979). Here, the drivers have freedom to develop their own business, including providing taxi services away from the airport. The drivers are also free to work as little or as much as they would like and they can hire relief drivers to operate the vehicle when they are not working. Accordingly, the drivers' opportunities for profit or loss depend a great deal on how they utilize their vehicles. This factor weighs in favor of an independent contractor relationship.

### iii. The Drivers' Investment

The third factor depends on the drivers' "investment in equipment or materials required for [their] task, or [their] employment of helpers." *Real*, 603 F.2d at 754. The drivers do not purchase their own vehicle nor are they required to purchase any other equipment.[4] The drivers are also free to hire "helpers" in the form of relief drivers.

---

[4] The drivers are required to purchase gas and, if they wish, they can purchase their own credit card terminal and their own business cards.

These additional drivers allow the drivers substantial freedom to craft their own work schedules and maximize the usage of the leased vehicles. Therefore, on balance, this factor is neutral.

### iv. The Drivers' Skills

The fourth factor turns on "whether the service rendered requires a special skill." *Real*, 603 F.2d at 754. Driving a vehicle is not a special skill. This factor, therefore, supports an employment relationship.

### v. Degree of Permanence

The fifth factor involves "the degree of permanence of the working relationship." *Real*, 603 F.2d at 754. AAA Cab claims the relevant "working relationship" is between the drivers and their customers. AAA Cab does not cite any authority identifying that as the relevant relationship and doing so makes little sense. Existing authority identifies the relevant relationship as that between the putative employees and putative employer. *Cf. Carrillo v. Schneider Logistics Trans-Loading and Dist., Inc.*, 2014 WL 183956, at *14 (C.D. Cal. Jan. 14, 2014) (noting in joint employer case this factor "assesses whether there was permanence in the working relationship between the asserted joint employer and the plaintiff employees"). The relationship between the drivers and AAA Cab is often lengthy. For example, one individual drove for AAA Cab for approximately eight years. Another driver has been a driver since 2011. (Doc. 205 at 21). The often-lengthy relationship between AAA Cab and its drivers weighs in favor of an employment relationship.

### vi. Integral Part of Business

The sixth factor turns on "whether the service rendered is an integral part of [AAA Cab's] business." *Real*, 603 F.2d at 754. There is no dispute the service the drivers provide *is* AAA Cab's business. This factor also weighs in favor of an employment relationship.

### vii. Conclusion

The foregoing factors inform but do not dictate a particular conclusion. For

purposes of AAA Cab's motion for summary judgment, the Court must determine whether the facts viewed in the light most favorable to the drivers establish there is at least a question of fact regarding their status. In brief, the drivers lease vehicles at a fixed rate, are free to work when they want for as long as they want, and are free to hire and pay relief drivers if they do not wish to operate the vehicles themselves. The City, not AAA Cab, controls most of the drivers' day-to-day working environment and that control cannot be attributed to AAA Cab. While other factors weigh in favor of an employment relationship, those factors are not enough to change the "economic reality" of the relationship between AAA Cab and its airport. Therefore, under federal and Arizona law AAA Cab is entitled to summary judgment that the drivers are not employees.

Accordingly,

**IT IS ORDERED** the Motion for Partial Summary Judgment (Doc. 205) is **DENIED**.

**IT IS FURTHER ORDERED** the Motion for Summary Judgment (Doc. 215) is **GRANTED**.

**IT IS FURTHER ORDERED** no later than March 26, 2015 the parties shall file a joint proposed judgment for entry in this case.

Dated this 18th day of March, 2015.

Honorable Roslyn O. Silver
Senior United States District Judge